## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 29 2019, 10:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Corey R. Faith, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | May 29, 2019 <br><br> Court of Appeals Cause No. 18A-CR-2901 <br><br> Appeal from the Harrison Superior Court <br><br> The Honorable Joseph L. Claypool, Judge <br><br> Trial Court Cause No. 31D01-1803-FA-204 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Corey Faith (Faith), appeals his sentence following his guilty plea to three Counts of child molesting, Class A felonies, Ind. Code § 35-42-4-3(a)(1) (2005).

We reverse.

# ISSUE

Faith presents a single issue on appeal, which we restate as: Whether Faith's sentence is inappropriate in light of the nature of the offenses and his character.

# FACTS AND PROCEDURAL HISTORY

A.B., born in 1992, A.B.'s younger brother, and A.B.'s parents, resided in Harrison County, Indiana. A.B. first met Faith when she was in third grade at New Middletown Elementary. Faith, born in 1977, was a substitute teacher. When A.B. reached sixth grade during the 2004-05 school year, Faith was A.B.'s full-time teacher.

A.B.'s mother suffered from severe mental illness and had attempted suicide many times. A.B. had witnessed some of the incidents. For instance, A.B. had seen her mother overdose and cut herself. One time when A.B. was either in third or fourth grade, she stood in front of her brother's bedroom door so as to shield him from seeing their mother dig stakes into her arm.

When A.B.'s mother was twelve years old, she was molested by her stepfather and her uncle. After A.B. turned twelve years, A.B.'s mother's mental illness

worsened and she "hit rock bottom" because looking at A.B. brought back memories of her being molested at that age. (Tr. Vol. II, p. 40). Around that time, A.B.'s mother began receiving in-patient mental health treatment at Wellstone Mental Hospital.

[7] With A.B.'s mother undergoing in-patient care for her mental illness, and her father working constantly to pay for it, A.B.'s parents knew that they needed someone who could watch A.B. and her brother whenever they were unavailable, so they asked Faith if he could assist with babysitting. Faith and his wife assumed care giving roles to A.B and A.B.'s brother. Faith began picking A.B. and her brother up from school, and he would keep them there until A.B.'s father picked them up. As A.B. and her brother saw less and less of their parents, they bonded and connected with Faith and Faith's wife. Faith knew everything about A.B.'s life, and A.B. felt that Faith was her "best friend." (Tr. Vol. II, p. 43). A.B. would sit and talk for hours on the phone with Faith. On days when A.B. was able to go home with her father, she would arrive home and call Faith. If she could not reach Faith on the phone, Faith had instructed A.B. to call and leave a voicemail, "and if he did not answer, to call in ten-minute increments of a number that ended in two." (Tr. Vol. II, p. 43).

[8] During A.B.'s sixth grade spring break, A.B.'s family, Faith and Faith's wife, went to Gatlinburg, Tennessee. They all stayed at a cabin at Pigeon Forge. There were two bedrooms upstairs, one for A.B. and her brother, and the other for A.B.'s parents. Downstairs, Faith and Faith's wife occupied a bedroom suit

that had a jacuzzi. Instead of sleeping upstairs, A.B. elected to sleep on the couch downstairs. Prior to this trip, Faith had already started kissing A.B. whenever they were alone. At some point during the night, Faith's wife was soaking in the jacuzzi. Faith saw that as opportunity to kiss and touch A.B. When Faith heard his wife getting out of the jacuzzi, he stopped and went back to the master bedroom. Once his wife was asleep, Faith returned to the couch and "laid with [A.B.] for a little bit longer." (Tr. Vol. II, p. 46).

[9] That Easter, Faith taught A.B. to play tennis. After the game, the two went back to Faith's house so that Faith could shower. A.B. was in Faith's bedroom watching television. When Faith was done showering, he walked out of the shower while naked. A.B. did not say a word. After Faith got dressed, the two moved into the living room, and A.B. sat on Faith's lap. After kissing for a while, Faith "put his hands down [A.B.'s] pants." (Tr. Vol. II, p. 51). While touching A.B.'s pubic hair, Faith informed A.B. that for a twelve-year-old, she "was a little bit more developed than he thought." (Tr. Vol. II, p. 51). Faith continued to touch and kiss A.B., and he eventually inserted his finger inside A.B.'s vagina. Suddenly, Faith stopped and began "bawling his eyes out." (Tr. Vol. II, p. 52). A.B. did not understand why Faith was crying, but all she knew at the time was that she "cared so much about him" and she "didn't want him to be sad." (Tr. Vol. II, p. 52).

[10] Following that incident, the relationship between A.B. and Faith advanced. Faith and A.B. would talk on the phone for forty-five minutes. Faith's wife began complaining that the two were spending too much time on the phone.

A.B. would also lie to her father as to whom she was talking on the phone. Because A.B. was not allowed to be on the phone past 9:00 p.m. and had to be in bed by 10:00 p.m., she would wait until her family was asleep and then sneak house phones to her bedroom to talk to Faith. During one of their many nighttime calls, Faith uttered the possibility of "the snake going to explore the cave." (Tr. Vol. II, p. 53). A.B. partially understood what Faith intended. She was so young that she "couldn't even say the word penis or vagina," she didn't know what the "snake was. All [she] knew was that [Faith] wanted the snake to go in." (Tr. Vol. II, p. 53)

[11]    A.B.'s mother would be in the hospital for "two to three months and then be home for a week, and then go back, [] because she couldn't handle life." (Tr. Vol. II, p. 54). A.B.'s father was either working or visiting A.B.'s mother in hospital. Because of their parents' absence, A.B. and her brother began spending the night at Faith's house. A.B. slept in an upstairs bedroom, while her brother slept in a downstairs bedroom. One time when A.B.'s brother and Faith's wife were asleep, Faith sneaked into A.B.'s bedroom. Faith stated that he "just wanted the snake to see the cave." (Tr. Vol. II, p. 54).

[12]    From that point on, every time Faith and A.B. were alone, Faith would engage in sexual activities with A.B. Faith had intercourse with A.B. so many times that A.B. stopped counting. For the specific instances that she remembered, however, Faith had intercourse with her five times when she was on a futon in his upstairs room; two times when he placed her on top of his lap as he sat on the toilet; one time when Faith bent her over the staircase; one time in Faith's

living room when her brother slept on the couch next to them; one time in A.B.'s bedroom after school while her brother watched wrestling on the television in another room; one time in her bedroom after Faith scared her by standing next to the bed as she woke up; three times in the girl's locker room at the school when she helped Faith as his assistant with basketball practice; five times in Faith's classroom after A.B. reached seventh grade; one time in Faith's bed; and one time at Faith's parents' house in his old bedroom before they went to swim in the pool.

[13] When he was not engaging in intercourse with A.B., he fingered her vagina or had her perform oral sex on him. Every time they were alone in Faith's vehicle, he would either touch her or would have her perform oral sex on him while he drove, and he would continue driving until he ejaculated in A.B.'s mouth. During the times A.B.'s brother was in the car, Faith would drive around until he fell asleep and then he would begin touching and fondling A.B.

[14] In addition, Faith had A.B. engage in phone sex. One time he asked her to "play with that pussy" and say things like "fuck me Corey." (Appellant's App. Conf. Vol. II, p. 61). Another time, Faith asked A.B. to put an Alka-Seltzer tablet in her vagina, and A.B. stated that it "burned like fire." (Appellant's App. Conf. Vol. II, p. 56). Another time, Faith called A.B. on the phone and instructed her to "stand naked" in "the window and touch her vagina while shining a light on herself so he could watch her while driving past." (Appellant's App. Conf. Vol. II, p. 56).

[15]     A.B. was aware that her mother had been molested by her stepfather and her uncle when she was about twelve years old. In November of 2005, A.B. and her mother were watching a game on the television. Talking about molestation, A.B.'s mother informed A.B. that she would be devastated if anyone ever molested her. In fact, A.B.'s mother stated that she "would die" if the same thing happened to A.B. (Tr. Vol. II, p. 55). A.B. was "confused," and she "didn't want [her] mom to die," thus, she did not disclose that Faith was molesting her. (Tr. Vol. II, p. 55). In her mind, Faith was not hurting her. When A.B. disclosed to Faith about the talk she had with her mother, Faith assured A.B. of his love for her, and that he was there to help.

[16]     One day while Faith and A.B. were fishing at a campground, Faith asked A.B. to be his girlfriend. Initially A.B. said no because Faith was married, but Faith persisted. Eventually A.B. relented and agreed to be Faith's girlfriend. Faith led A.B. to believe that they would someday elope to Tennessee and get married. A.B. was crushed when she learned that Faith's wife was pregnant with their first child. Even after that, Faith and A.B. continued to have an "on and off relationship." (Tr. Vol. II, p. 60).

[17]     In 2016, A.B.'s mother committed suicide. By that time, A.B. was in her mid-twenties, had a son, and was living in Florida. A.B. realized that her mother was the reason why she kept Faith's actions secret. A.B. struggled to reconcile her thoughts and feelings about what happened to her; she knew what Faith did was wrong, but she also wanted to believe that he did it because he loved her. A.B. fell into a "horrible, horrible depression," and she could not sleep. (Tr.

Vol. II, p. 60). The woman who hired A.B. ended up becoming a close friend. A.B. eventually disclosed to the woman that Faith molested her when she was twelve years old. The woman then called the school board where Faith worked and reported Faith.

[18] On March 26, 2018, the State filed an Information, charging Faith with thirty-six Counts of Class A felony child molesting. On September 10, 2018, Faith pleaded guilty to three Counts. The remaining Counts were dismissed, and sentencing was left open to the trial court. The trial court accepted Faith's guilty plea and entered a judgment of conviction against Faith for three Counts of Class A felony child molesting. On the same day, the trial court conducted a sentencing hearing and sentenced Faith to consecutive terms of thirty years on each Count in the Department of Correction (DOC). However, the trial court suspended twenty years of his aggregate sentence.

[19] Faith now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

[20] Faith argues that his aggregate ninety-year sentence, with twenty years suspended, for his three Class A felony child molesting convictions is

inappropriate.[1]  Without addressing the fact that the trial court suspended twenty years of his aggregate sentence, Faith is requesting that we revise his three consecutive thirty-year sentences and order his sentence to be served concurrently, therefore resulting in an aggregate sentence of thirty years.

[21]  We may revise a sentence if it is inappropriate in light of the nature of the offense and the character of the offender.  Ind. Appellate Rule 7(B).  The defendant has the burden of persuading us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).  The principal role of a Rule 7(B) review "should be to attempt to leaven the outliers and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008).  "Appellate Rule 7(B) analysis is not to determine whether another sentence is more appropriate but rather whether the sentence imposed is inappropriate." *Conley v. State*, 972

---

[1] Faith also challenges the trial court's order imposing consecutive sentences.  Faith's argument on this issue is comprised entirely of references to the nature of the offenses and his character—the standard employed under Indiana Rule of Appellate Procedure 7(B), which applies to inappropriate sentencing claims.  He does not directly present or develop any argument regarding the trial court's imposition of consecutive sentences, *i.e.,* that the multiple offenses constitute a single episode of criminal conduct or even that the trial court failed to state its reasons for imposing consecutive sentences. *See Johnson v. State*, 785 N.E.2d 1134, 1143 (Ind. Ct. App. 2003), *trans. denied*.  Thus, we conclude that he has failed to present a cogent argument in support of this claim and has, therefore, waived the issue. *See* Ind. App. Rule 46(A)(8)(a).

N.E.2d 864, 876 (Ind. 2012) (internal quotation marks and citation omitted), *reh'g denied*. Whether a sentence is inappropriate turns on "the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case." *Cardwell*, 895 N.E.2d at 1224.

[22] When determining whether a sentence is inappropriate, we acknowledge that the advisory sentence "is the starting point the Legislature has selected as an appropriate sentence for the crime committed." *Childress*, 848 N.E.2d at 1081. For his Class A felony child molesting offenses, Faith faced a sentencing range of twenty to fifty years, with the advisory sentence being thirty years. I.C. § 35-50-2-4 (2005). Faith was sentenced to serve consecutive thirty-year terms on each Count, with twenty years suspended. Thus, the trial court imposed an aggregate ninety-year sentence with twenty years suspended.

[23] Turning to the specifics of Faith's offenses, the record shows that A.B.'s mother suffered from mental illness and she spent much of her time in the hospital receiving treatment. A.B.'s father spent most of his time working trying to make that treatment financially feasible. A.B.'s parents trusted Faith, and Faith held himself out as a dependable caregiver, using his position to ingratiate himself into A.B.'s family. By default, Faith became A.B.'s and her brother's caregiver when A.B.'s parents were unavailable. Faith then repeatedly molested A.B. when she was twelve years old.

[24] As for Faith's character, we acknowledge, as the trial court did, that Faith has no prior criminal history, was employed for seventeen years as an elementary school teacher and had friends who attested to his positive character traits. Further, we acknowledge Faith is also an involved father in the lives of his two minor children.

[25] Faith argues that the molestations only occurred when A.B. was in sixth grade, he did not use force, and that she was the only victim. As such, he claims that his consecutive sentences are inappropriate in light of the nature of the offenses and his character.

[26] We acknowledge that, when exercising our power to review and revise a sentence, we are not required to compare a defendant's sentence with sentences received by other defendants in similar cases. *Corbally v. State*, 5 N.E.3d 463, 471-72 (Ind. Ct. App. 2014). "However, comparison of sentences among those convicted of the same or similar offenses can be a proper consideration when deciding whether a particular sentence is inappropriate." *Id.* at 472. "[A] respectable legal system attempts to impose similar sentences on perpetrators committing the same acts who have the same backgrounds." *Serino v. State*, 798 N.E.2d 852, 854 (Ind. 2003).

[27] In arguing that his sentence is inappropriate, Faith relies on *Monroe v. State*, 886 N.E.2d 578 (Ind. 2008). In *Monroe*, Monroe was convicted of five Counts of Class A felony child molesting. The trial court sentenced him to twenty-two years on each Count with two years suspended to probation and ordered the

sentences to be served consecutively for an aggregate sentence of 100 years. In considering the nature of the offense on appeal, our supreme court noted that Monroe was in a position of trust with his victim and molested the child repeatedly for over two years. *Id*. at 580. However, the court also observed that the five Counts were identical and involved the same child. *Id*. Regarding Monroe's character, the court noted that although he had a prior criminal history, all of his convictions were driving related, so his criminal history did not justify the imposition of consecutive sentences. *Id*. Based on these facts and circumstances, the supreme court concluded that the nature of the offenses and Monroe's character warranted enhanced, but not consecutive, sentences. *Id*. at 581. The supreme court revised Monroe's sentence to a maximum fifty-year term for each of the five Counts but ordered that they be served concurrently. *Id*.

[28] Similarly, in *Harris v. State*, 897 N.E.2d 927 (Ind. 2008), Harris was convicted of two Counts of Class A felony child molesting and sentenced to consecutive fifty-year terms. *Id*. Our supreme court noted that Harris had occupied a position of trust with the eleven-year-old victim and had committed multiple uncharged acts of sexual misconduct that occurred over a period of time. *Id*. However, as in *Monroe*, the court observed that the two Counts of child molesting were identical and involved sexual intercourse with the same child. *Id*. Although Harris had a prior criminal record, the Supreme Court emphasized that he had no prior sex offenses in his record and concluded that his criminal history was not a significant aggravator. *Id*. at 930. Based on the

facts and circumstances of the case, the Supreme Court held that consecutive sentences were not warranted and revised Harris' sentence to two concurrent fifty-year terms. *Id.*

[29] The principle role of review under Rule 7(B) is to attempt to leaven the outliers. *Merida v. State*, 987 N.E.2d 1091, 1092 (Ind. 2013). We find this case similar to the cases discussed above finding consecutive sentences for child molesting inappropriate. In the instant case, the trial court ordered three consecutive sentences of thirty years for each Count, for a total executed sentence of ninety years, but suspended twenty years. The three Counts of child molestation were identical and involved the same child. *See Monroe,* 886 N.E.2d at 580. Further, there was no evidence that Faith inflicted physical injury to A.B. when he committed these offenses. At the time of sentencing, Faith was forty-one years old and had no prior criminal history. Faith's position of trust over A.B. and the fact that there were repeated incidents of molestation, are egregious circumstances, but are similar to those in *Monroe* and *Harris.*

[30] We believe Faith's position of trust was sufficiently aggravating to justify an enhanced sentence. However, Faith lacked a criminal history and his steady employment together with the fact that these acts were all identical and committed against one victim lead us to conclude that consecutive sentences were inappropriate. Therefore, we revise Faith's sentence to concurrent thirty-year terms for his three Counts of Class A felony child molesting offenses, with no time suspended. *See Laster v. State*, 918 N.E.2d 428, 434-35 (Ind. Ct. App. 2009) (revising consecutive advisory sentences to concurrent enhanced

sentences where the defendant committed multiple acts of molestation against one child).

## CONCLUSION

[31] Based on the foregoing, we conclude that Faith's ninety-year aggregate sentence is inappropriate in light of the nature of the offenses and his character. Thus, we revise Faith's sentence to concurrent thirty-year terms, with no time suspended, on all three Counts.

[32] Reversed.

[33] Bailey, J. and Pyle, J. concur